UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

UNITED STATES OF AMERICA,

                 Plaintiff,

       - against -

United States Currency in the Sum of One
Hundred Eighty-Five Thousand Dollars
($185,000) more or less and Twenty-Four
Thousand Six Hundred Fifty Dollars ($24,650)
more or less,

               Defendants.

----------------------------------------------------------X

**MEMORANDUM AND ORDER**

1:04-cv-883-ENV-CLP

VITALIANO, D.J.

       This is a civil action brought by the United States of America ("Government"), pursuant to 21 U.S.C. § 881(a)(6), seeking the condemnation and forfeiture of United States currency which the Government alleges is connected to the drug trade. Over $200,000 was seized from a car whose driver, Victor Escobar ("Escobar"), has filed a claim of ownership. The Government alleges that Escobar was transporting the currency for drug traffickers. Escobar, a non-citizen with no documented source of even modest income, has a history of being stopped by police with hundreds of thousands of dollars in cash. In this episode, Escobar avers that he was an innocent possessor of the disputed funds with an obligation to return the currency to its true owner. Not surprisingly, Escobar has nonetheless invoked his Fifth Amendment privilege in response to the Government's pretrial discovery questions seeking information relating to that true owner's identity.

The dispute has now been brought to a head on motions filed by Escobar (to suppress for purposes of this action evidence illegally seized from him and to dismiss the Government's claim) and by the Government (for summary judgment or, alternatively, to strike Escobar's claim). For the reasons set forth, this Court concludes that the Government is entitled to summary judgment as it has clearly met its burden of showing, by a preponderance of the evidence, that the seized currency was substantially connected to narcotics trafficking. The other motions, as a result, are rendered academic.

## BACKGROUND

I.    *August 20, 2003 Seizure of Disputed Funds*

The events giving rise to this forfeiture action began on August 20, 2003, at approximately 6:15 p.m., when two New York City police officers were conducting routine surveillance in an area of Queens that the officers claim had a high rate of narcotics transactions. The officers were driving slowly in an unmarked 15 passenger prisoner van when the driver, from the elevated vantage point of the van, observed what he thought to be suspicious activity in a car parked to his left. The officer observed the car's driver holding money in his hand with his head turned toward the back seat where a female passenger was rummaging through a fanny pack. Based on his years of experience, the officer believed the movement was consistent with that of a narcotics transaction. The officer stopped his van and approached the car on foot, at which point he saw the driver, Victor Escobar, drop the money in his hand onto the car's dashboard while the female passenger pushed the fanny pack from her lap.

The officer asked Escobar to step out of the car. All passengers in the car obliged by

2

exiting the vehicle. The officer then began to ask questions, but the Spanish-speaking Escobar did not respond. The officer next reached into the car's back seat and retrieved the fanny pack, which he claims was in plain view, revealing a large wad of cash packaged with rubber bands. The fanny pack contained $24,650 in United States currency. After retrieving the fanny pack, the officer continued to ask questions but received no response. The officer, undaunted, persisted in his questioning and asked Escobar if the vehicle contained any additional currency. The officer warned Escobar that he would find the money regardless of Escobar's answer. Escobar allegedly responded to the officer through one of the car's other passengers, whom the officer later claimed was acting as a translator. With the mediacy of the translator, Escobar allegedly handed over the car's keys and informed the officer of additional currency in the car's trunk. After taking the keys, the officer opened and searched the trunk, where he found a closed knapsack. He opened the knapsack and discovered a large amount of currency bundled in heat sealed plastic. This currency would amount to $185,000.

When a Spanish-speaking police officer later arrived at the scene, Escobar asserted that he was merely transporting the money for a $2,000 fee. He also asserted that the car did not belong to him. The officers asked Escobar for identification and he produced an "international driver's license." The arresting officer believed this international driver's license was a phony because it had a local address on it.[1] The officers then arrested Escobar for second-degree

---

[1] While there exists an "international driving permit," this Court is unaware of the existence of a recognized "international driver's license." Thus, it appears that Escobar did not produce a forgery of a valid license but instead a document that was of no effect altogether. See U.S. Federal Trade Commission, FTC Consumer Alert - Ads for International Drivers' Licenses or Permits Could Be a Dead End (2003), http://www.ftc.gov/bcp/conline/pubs/alerts/driveralrt.pdf.

forgery but released the car's other passengers.

After being arrested and taken to the police station, Escobar was questioned by a police officer in his holding cell at approximately 8:15 p.m. The officer never gave Escobar his Miranda Warnings and claimed, at a state court suppression hearing, that the questioning was merely an attempt to obtain routine pedigree information. Escobar confessed to the officer that he was simply transporting "the papers" and, at the officer's request, Escobar wrote out a statement to that effect. Escobar would not, however, take the next step of signing his statement.

II.    *State Court Proceedings*

After Escobar's arrest, he was indicted in Queens County for second-degree money laundering. He was held in prison for eight and one-half months on $500,000 bail while he awaited trial. State authorities offered Escobar a conditional discharge if he would plead guilty to a noncriminal violation and waive any claim that he had to the seized currency. Escobar refused. On February 10, 2004, a suppression hearing was held before Justice Sheri S. Roman of the New York Supreme Court, Queens County. Justice Roman determined that the search, seizure, arrest, and interrogation of Escobar had been illegal. The indictment against Escobar was subsequently dismissed.

III.    *July 14, 2004 Seizure of Funds in North Carolina*

On July 14, 2004, Escobar was a passenger in a motor vehicle that was stopped in Johnston County, North Carolina for moving violations. The car was driven by Escobar's one-time roommate, Andres Rodriguez. Escobar told the officer that he was in the United States on vacation, but he produced a Colombian passport indicating that he had, in fact, entered the

4

United States several years earlier. The officer then had a canine sniff the car's exterior. A subsequent search of the car revealed two envelopes and a Frosted Flakes cereal box containing large sums of money, amounting in total to $433,980. Law enforcement authorities seized the currency but did not charge Escobar with respect to this incident. Escobar's attorney asserts here that his client had neither knowledge nor a possessory interest in the North Carolina seized funds.

IV.    *April 4, 2005 Seizure of Funds in Florida*

On April 4, 2005, two border patrol agents stopped Escobar at a Greyhound bus terminal in Orlando, Florida. Escobar told the officers that he was from Colombia but he failed to produce any immigration documents. The officers thus took Escobar into custody and, in response to questioning, Escobar revealed that he had approximately $400,000 stored in his luggage. After a search of that luggage, which showed that the currency was concealed within taped boxes, the officers seized the funds and began an investigation.

During an interview following the incident, Escobar admitted that he was transporting the money for a Colombian money broker who worked with the Colombian drug cartel. Escobar also admitted that he had conducted similar business in New York. He told the investigators in Florida that, at the time of his August 2003 arrest in New York, he was working as a money courier in New York for a Colombian female, whom he identified as Marie. He admitted that he had, on several occasions, transported money in the New York area at Marie's direction, but that Marie ended his employment after his August 20, 2003 arrest and the seizure of the defendant funds.

V.    *Evidence of Escobar's Income*

At his deposition, Escobar gave information regarding his income. In 2000 and 2001, he earned between $60 and $80 per week working as a limousine driver. During 2002 and 2003, he earned a total of between $3,000 and $4,000 while working for a friend, and he also earned approximately $200 to $300 per week through unspecified self-employment. Escobar's income tax return for 2002 – the only he has filed – shows income of $2,200. Escobar's bank account at Fleet Bank/Bank of America shows a balance of no more than $2,000 during the life of the account. Escobar testified that the Fleet account was his only bank account in the United States, though he asserted that he also had a Colombian bank account, the maximum balance of which was $10,000 over the previous eight years.

VI.    *Procedural History*

On October 3, 2003, the United States Drug Enforcement Administration adopted the New York City Police Department's August 2003 seizure of currency from the vehicle driven by Escobar. The Government commenced this civil forfeiture action on March 2, 2004. Victor Escobar filed a verified claim on May 13, 2004, in which he asserts that he is the owner of the property subject to forfeiture.

**DISCUSSION**

The Government brings this civil action pursuant to 21 U.S.C. § 881(a)(6), which allows for forfeiture to the Government of:

> [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this

subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the Government must "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).[2]

CAFRA also provides that when "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). When the Government seeks forfeiture, pursuant to 21 U.S.C. § 881(a)(6), on a theory that property constitutes proceeds traceable to an exchange for narcotics, it need not prove that there is a substantial connection between the property and any specific drug transaction. See United States v. Twenty One Thousand Dollars in U.S. Postal Money Orders and Seven Hundred Eighty-Five Dollars in U.S. Currency, 298 F. Supp. 2d 597, 601-02 (E.D. Mich. 2003). Instead, the Government may prove more generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking. See, e.g., United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 467-70 (7th Cir. 2005). Finally, in determining whether the Government has met its burden, the Court may consider

---

[2] Prior to the enactment of CAFRA, the Government needed only to establish probable cause that property was forfeitable, at which point, the burden shifted to the claimant to show, by a preponderance of the evidence, that the property was not forfeitable. See 19 U.S.C. § 1615 (2000) (superseded with respect to civil forfeitures by 18 U.S.C. § 983(c) (2000)); United States v. Parcel of Property, 337 F.3d 225, 227 (2d Cir. 2003).

evidence gathered after filing the forfeiture complaint. 18 U.S.C. § 983(c)(2).

I.    *Claimant's Fifth Amendment Privilege and his February 24, 2006 Affidavit*

The Government deposed Escobar in this action on May 16, 2005. At that deposition, Escobar repeatedly invoked his Fifth Amendment privilege against self-incrimination in response to almost all questions regarding his ownership interest in the money subject to forfeiture, except to state his legally mistaken belief that he was the money's true owner because it was once in his possession. When the Government asked additional questions to clarify and develop Escobar's claim of possessory interest, that is, whether he had legitimate business or personal reasons to carry such extraordinarily large sums of cash, Escobar refused to provide answers and again opted to invoke his Fifth Amendment privilege. He also pled the Fifth Amendment in response to questions regarding the events surrounding his arrest on August 20, 2003, even though charges stemming from that incident had previously been dismissed, and again when the Government asked whether police had ever stopped him while he was a passenger in a car in North Carolina. Escobar's responses to interrogatories were similarly lacking in substance.

Escobar, of course, has acted well within his rights by invoking his Fifth Amendment privilege. However, a "party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence." United States v. Taylor, 975 F.2d 402, 404 (7th Cir. 1992). By invoking his privilege, Escobar runs the risk of failing to put forth any evidence to support his claim or to oppose the Government's claim. Even in a civil forfeiture case, a litigant may not avoid summary judgment just by invoking the privilege. United States v. 4003-4005 5th Ave., 55 F.3d 78, 83 (2d Cir. 1995) ("[T]he claim of privilege will not prevent an adverse finding or

even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation."). As the Supreme Court has explained,

> while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production. We think the view of the Court of Appeals would convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his. None of our cases support this view.

United States v. Rylander, 460 U.S. 752, 758, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

Escobar, undeterred, claims shield, sword, and more. After repeatedly invoking his Fifth Amendment privilege during discovery, Escobar filed an evidentiary affidavit on February 24, 2006. In the affidavit, Escobar transparently attempted to manufacture issues of material fact to avoid summary judgment. Addressing his April 2005 detention in Florida, which followed his removal from a Greyhound bus with luggage containing $400,000, Escobar's affidavit swears that he lied when he remarked to law enforcement officials in Florida that he was carrying the Florida money at the direction of individuals involved with the Colombian drug cartel. Addressing the incident of July 2004, in which Escobar was a passenger in a car stopped in North Carolina containing more than $433,980, Escobar's affidavit asserts that he had no knowledge of the currency in the vehicle. Finally, the affidavit summarily denies that Escobar has ever been an illegal courier of currency.

Submitted long after the discovery train had left the station, Escobar's affidavit addressed

the very issues about which he had earlier invoked his Fifth Amendment privilege. The Government cried foul, arguing that Escobar's peek-a-boo assertion of his Fifth Amendment privilege was an abuse of the discovery process tailored to manufacture grounds upon which he could contest the pending summary judgment motion. See 4003-4005 5th Ave., 55 F.3d at 85 (affirming the district court's decision to preclude a claimant from submitting an affidavit along with his response to a motion for summary judgment because he had acted in an obstructionist fashion in discovery by earlier invoking his privilege). The Government moved to strike the affidavit.

This Court responded by informing the parties that it would consider entertaining the belatedly submitted affidavit if it also signaled an intent by Escobar to waive his Fifth Amendment privilege and submit to a continued deposition regarding all issues raised by the affidavit. By letter, dated May 23, 2006, Escobar's counsel responded, without citing any legal authority, that Escobar would not otherwise waive his Fifth Amendment privilege but that the Court should nonetheless consider the affidavit. Counsel's inability to cite such authority hardly comes as a shock since his argument contravenes the well-established rule that a witness may not give direct testimony and then invoke his privilege on cross-examination. It matters not, as here, that the witness attempts to give his direct testimony through an affidavit. See United States v. Parcels of Land, 903 F.2d 36, 43-44 (1st Cir. 1990). Where the affiant refuses to submit to cross-examination regarding its contents, the affidavit cannot be considered.

In his May 23 letter, however, Escobar's counsel also requested, for the first time, that the

Court hold this matter in abeyance until the conclusion of any law enforcement investigation which may be pending in Florida regarding the April 2005 incident in which Escobar was found with another $400,000 in currency. Escobar suggested a Fifth Amendment basis for his application. In entertaining the application, this Court is well aware that "appellate courts have held that upon a *timely* motion by the claimant, district courts should make special efforts to 'accommodate both the constitutional [privilege] against self-incrimination as well as the legislative intent behind the forfeiture provision.'" 4003-4005 5th Ave., 55 F.3d at 83 (quoting United States v. United States Currency, 626 F.2d 11, 15 (6th Cir.), cert. denied, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980)) (alteration in original; emphasis added). Here, however, counsel's request is not timely. Counsel could have requested a stay at any time after the April 2005 incident in Florida. Instead, counsel neglected to raise this issue until 13 months later, following the close of discovery and after an oral argument on fully-briefed dispositive motions submitted not only by the Government but by Escobar as well. Moreover, even with the extra time afforded by this very untimely request for a stay, Escobar still fails to indicate "with precision how he would be prejudiced if the civil action went forward" while the Florida investigation were ongoing, especially given the dismissal of the parallel criminal proceeding regarding the currency that the Government is actually seeking here to forfeit. United States v. Certain Real Property, Commonly Known as 6250 Ledge Road, 943 F.2d 721, 730 (7th Cir. 1991). In short, Escobar's nebulous and untimely invocation of his Fifth Amendment privilege does not justify further delay in the adjudication of the motions now before the Court and of the Government's forfeiture claim overall.

As for Escobar's affidavit, filed on February 24, 2006, it is entitled to absolutely no weight whatsoever for the reasons stated and is hereby stricken from the record to be considered on the motions.

II.    *Government's Motion to Strike for Lack of Standing*

The Government has moved both for summary judgment on its forfeiture claim and to strike Escobar's claim to the seized currency due to his lack of Article III standing. Regarding Escobar's Article III standing, the parties disagree as to the applicable law in the Second Circuit. Escobar argues that in United States v. $557,933.89, 287 F.3d 66 (2d Cir. 2002), the Second Circuit held, contrary to its prior case law, that the mere filing of a verified claim to seized currency is sufficient to satisfy standing requirements in a forfeiture action. In making this argument, Escobar latches on to the Court's statement that "because [claimant] submitted a verified claim that he was the owner of the funds, we hold that he showed a sufficiently colorable interest to satisfy Article III standing requirements."[3] Id. at 79 n.10. Of course, while this might be true when a claimant initially brings his claim, it does not follow that the Government is forever foreclosed from challenging standing at some later point. It would be a frankly startling proposition that an assertion of fact in a pre-discovery initiatory pleading should not be subject to later attack on the basis of discovery's revelations.

Furthermore, the posture of the case now before this Court is very different from the case

---

[3] In $557,933.89, Judge Sotomayor also questioned whether Article III standing requirements should even apply to a claimant in a civil forfeiture case since it is the Government, and not the claimant, that invokes the federal court's jurisdiction. See $557,933.89,287 F.3d at 79 n.9.

posture in $557,933.89. Fatal to the Government's standing claim there was its late invocation of the standing issue. The Government questioned the claimant's standing based on a finding of the jury and then only on appeal at an oral argument. Id. at 78. The Second Circuit noted that if it were to revisit standing post-verdict based on the evidence adduced at trial, it would encourage unproductive "tail-chasing" by district courts. Id. (citing United States v. $9,041,598.68, 163 F.3d 238, 245 (5th Cir. 1998)). The Court, accordingly, reviewed only the original threshold determination that the claimant could sustain his claim and concurred.

Since here we are neither at threshold nor has a horse carrying a verdict long bolted from the barn, but rather, at a dispositive point in between, the decision in $557,933.89 does not limit this Court's inquiry into Escobar's filing of a verified claim. See, e.g., United States v. U.S. Currency in the Sum of Eighteen Thousand Eight Hundred Dollars, No. 02 Civ. 5752(SJF), 2004 U.S. Dist. LEXIS 25055 (E.D.N.Y. 2004); United States v. One Hundred Thirty-Eight Thousand, Three Hundred Eight-One Dollars in U.S. Currency, 240 F. Supp. 2d 220 (E.D.N.Y 2003). Moreover, the language of CAFRA itself supports this conclusion. For example, in 18 U.S.C. § 981(g)(7), which deals with a claimant's request for a stay of forfeiture proceedings, the statute provides that "[a] determination by the court that the claimant has standing to request a stay pursuant to paragraph (2) shall apply only to this subsection and shall not preclude the Government from objecting to the standing of the claimant *by dispositive motion or at the time of trial*." (Emphasis added). Such language more than suggests that the Government may, upon the proffer of substantive evidence, challenge standing on motion or at trial; it commands such conclusion.

This Court is mindful, however, that CAFRA was intended to and has altered the landscape of forfeiture law. Prior to the passage of CAFRA, the Government, in pursuing a forfeiture claim, needed only to make an initial showing of probable cause for forfeiture and the burden then shifted to the claimant to show, by a preponderance of the evidence, that the property was not subject to forfeiture. See 19 U.S.C. § 1615 (2000) (superseded with respect to civil forfeitures by 18 U.S.C. § 983(c) (2000)); United States v. Parcel of Property, 337 F.3d 225, 227 (2d Cir. 2003). Under CAFRA, it is the Government's burden to show, by a preponderance of the evidence (and not probable cause), that forfeiture applies. Until the Government makes its showing, a claimant need not make any showing. $557,933.89, 287 F.3d at 77; see also United States v. $506,321 in U.S. Currency, 125 F.3d 442, 454 (7th Cir. 1997). Challenges to a claimant's standing before resolution of the Government's underlying claim of forfeiture could allow the Government to avoid CAFRA's elevated burden of proof. Put another way, if the claim is stricken for want of standing, the Government is left with an uncontested case and may succeed on less than what CAFRA requires.[4] Here, the Court need not tarry on matters relating to Escobar's standing because, for the reasons stated below, the Government has met its burden

---

[4] Stefan D. Cassella of the United States Department of Justice has written extensively on forfeiture law and the passage of CAFRA and he posits, based on legislative history, that "[i]f the forfeiture is uncontested . . . the seizing agency will still be able to enter a declaration of forfeiture pursuant to 19 U.S.C. § 1609 based on probable cause." Stefan D. Cassella, The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on all Parties, 27 J. Legis. 97, 109 (2001). It is unclear if the Government may succeed on this lesser showing after a claim is stricken for lack of standing. For example, where the Government can prove by a preponderance that the claimant has no legitimate ownership interest but cannot establish by a preponderance that the seized funds are related to conduct entitling the Government to an award of forfeiture, are the funds in the limbo of a debate over which government account pockets the cash? The parties' submissions do not address this issue and the Court need not resolve it in this action because the Government is regardless entitled to summary judgment on the showing it does make.

of showing that the seized currency is substantially connected to the drug trade; indeed, that there is not even a genuine issue of material fact about it.

III.    *Government's Motion for Summary Judgment*

A district court may grant summary judgment upon finding that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that summary judgment is warranted. Huminski v. Corsones, 386 F.3d 116, 132 (2d Cir. 2004). In determining whether the moving party has met its burden, the Court construes all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and drawing all factual inferences in that party's favor. McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006). However, once the moving party makes a *prima facie* showing that summary judgment is warranted, the nonmoving party must put forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004). In so doing, the nonmoving party may not rely on conclusory allegations or speculation and must show that "its version of the events is not wholly fanciful."[5] Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting

---

[5] Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires that a party moving for summary judgment submit a numbered statement of the undisputed facts upon which it relies, with a citation to the admissible evidence supporting each fact. See Local Rule 56.1(a). The party opposing summary must file a counterstatement of material facts, indicating whether it contests each numbered fact that has been put forth by the moving party. See Local Rule 56.1(d). If the opposing party contests a fact, its counterstatement must include a citation to the admissible evidence upon which it relies. See Local Rule 56.1(b), (d). "[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that 'where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion.'" Holtz v. Rockefeller & Co., 258 F.3d 62, 73-74 (2d Cir. 2001) (quoting Watt v. New York Botanical Garden, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000)) (second alteration in original). The Court notes that numerous paragraphs of Escobar's counterstatement of material facts disregard Local Rule 56.1, substituting argument in place

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)). Finally, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Before the Court is uncontroverted evidence sufficient to entitle the Government to summary judgment. The portion of it relied upon by the Court in reaching its determination is as follows:

A.    *Amount of Currency & Lack of Legitimate Income*

During the August 2003 incident that led to this forfeiture proceeding, police seized over $200,000 in cash from a car driven by Escobar. The possession of such an extraordinary sum of cash is probative of illegal activity. See United States v. $31,990 in U.S. Currency, 982 F.2d 851, 854 (2d Cir. 1993) (presence of a large amount of cash supports an inference of illegal activity); United States v. $2,500 in U.S. Currency, 689 F.2d 10, 16 (2d Cir. 1982) (noting that cash amount of $2,500 "is substantially greater than is commonly kept in residential premises by law-abiding wage earners").[6] Escobar's August 2003 arrest is not the only one in which police

_____

of citations to admissible evidence. In these instances, the Court has searched the record for evidence supporting the assertions of counsel, but where no supporting evidence is present, the Court disregards the unsupported statements.

[6] Though the presence of a large sum of cash may be probative as to illegal activity, the Second Circuit has held that such evidence is not indicative of drug activity any more than it is indicative of other illegal activity. $31,990 in U.S. Currency, 982 F.2d at 854; see also United States v. $67,220.00 in U.S. Currency, 957 F.2d 280, 285 (6th Cir. 1992) ("[N]o court yet has held that the presence of a large sum of cash is sufficient, *standing alone*, to establish probable cause for forfeiture.") (emphasis added). Given that the mere presence of a large sum of cash is insufficient to establish probable cause for forfeiture, mere possession is obviously insufficient to support a finding of forfeitability by a preponderance of the evidence, as is required under CAFRA.

officers have seized a large amount of money from a motor vehicle in which Escobar was traveling. In April 2005, police in Florida seized approximately $400,000 in cash from Escobar's luggage in a Greyhound bus. In June 2004, police in North Carolina seized more than $400,000 in cash from a car driven by Escobar's roommate and in which Escobar was the sole passenger. While the mere possession of a large amount of cash is not illegal and should not be treated as such, the suspicion of illegal activity inevitably increases with the amount of money seized because there are so few instances in which an individual will legitimately be found carrying extraordinarily large sums of cash.

Of course, in Escobar's case, the Government submits more than mere possession. Also offered is Escobar's lack of any source of significant legitimate income. A great disparity between the amount of cash seized and its carrier's legitimate income creates an inference of illegal activity. Here, Escobar's income, demonstrated through Escobar's own testimony and records, is negligible compared with the vast amounts of cash seized from him. Escobar's only income tax return, for 2002, shows that his income was $2,200 for that year. His bank accounts within the United States show a balance of no more than $2,000 at any point. Escobar testified that between 2000 and 2003, he engaged in odd tasks, never earning more than $300 to $400 per week. Escobar offers no explanation for how he could have legitimately amassed the large sums of money that police have seized from him. At his deposition, in response to questions specifically regarding the currency which is the subject of this proceeding, Escobar invoked his Fifth Amendment privilege against self-incrimination. More to the point, Escobar offers no substantive challenge to this evidence which overwhelmingly suggests that he was involved in

illegal activity.

B.  *Escobar's Statements to Law Enforcement Authorities*

Though there is substantial evidence in the record to show that Escobar was involved in illegal activity, it is Escobar's own admissions that directly link the seized currency to the drug trade. Cf. United States v. $22,474.00 in U.S. Currency, 246 F.3d 1212, 1217 (9th Cir. 2001) (claimant's admission that he had previously been convicted of drug trafficking provides the necessary link to drug activity). During the April 2005 incident in which he was detained by authorities in Florida, Escobar made several incriminating statements. At a meeting with law enforcement officials, where his attorney – an assigned federal public defender – was present, Escobar admitted that he was transporting the Florida money for individuals who were involved with the Colombian drug cartel. He further admitted that he had conducted similar business in New York and that, at the time of his August 2003 New York arrest, he had been working as such a money courier in New York. Aff. of Albert Franklin, Jan. 6, 2006, ¶¶ 9-14.[7] This evidence harmonizes well with the other evidence in the record. While that other evidence clearly indicates that Escobar was involved in some sort of illegal money laundering, his admissions confirm that he was in the employ of individuals involved in the drug trade. Again, Escobar offers no contrary substantive evidence, as he is required to do on the Government's motion, that would create a genuine issue of material fact on this point.

---

[7] Albert Franklin, a special agent employed by the Department of Homeland Security, United States Immigration and Customs Enforcement, was present at the interview where Escobar made incriminating statements regarding his activities as a money courier. Escobar offers no challenge to the admissibility of Franklin's affidavit. See Oral Arg. Tr., May 18, 2005, at 63-66.

C.    *Escobar's Statements in this Litigation*

The pleadings and statements of Escobar and his counsel further conclusively establish that Escobar is not the title owner of the seized currency. Through his statements, Escobar concedes that he was a mere holder of the disputed funds. Specifically, in Escobar's Rule 56.1 statement, his counsel writes: "[c]laimant states that as the Defendant funds were in the possession and control of the Claimant and he was responsible for holding and preserving the said funds, those funds were, in legal effect, his at the time of the illegal seizure." Claimant's 56.1 Statement ¶ 53. Similarly, when asked at his deposition why he thought the money at issue was his, Escobar stated "[i]t is in my possession." Escobar Dep. at 37. These statements confirm what the record, as a whole, overwhelmingly suggests – that Escobar was merely transporting the money for another, whom he has refused to identify in this litigation. While the Court does not reach the issue of Escobar's standing, it notes that, though a claimant may assert that he is a bailee of the seized funds, see Mercado v. U.S. Customs Serv., 873 F.2d 641, 645 (2d Cir. 1989), the claimant must also indicate who the bailor of the funds is. See United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 498 (6th Cir. 1998). In point of fact, not only has Escobar not identified his alleged bailor, his initial claim did not even identify his interest was that of a bailee, as required by 18 U.S.C. § 983(a)(2)(C)(ii).

In any event, as the Sixth Circuit observed in $515,060.42, a claimant must give some explanation for his possession of the seized currency. 152 F.3d at 498. Such an explanation should include, at the least, "factual allegations regarding how the claimant came to possess the

19

property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property." Id. Throughout this action, Escobar has given no explanation regarding how he came into possession of the seized currency and, on Fifth Amendment grounds, he refuses to answer any question regarding the true owner's identity. Such silence is consistent with Escobar's admission to police in Florida, which is not challenged by any proof in admissible form, that he was involved in the business of transporting money for individuals involved with the Colombian drug cartel.

Based on all of the uncontroverted evidence, the Court can come to no other conclusion than that the Government is entitled to summary judgment on its forfeiture claim.[8] It is clear as day that, regardless of whether Escobar has an ownership interest in it, the seized currency was not legitimately obtained by him, and the evidence presented on the Government's summary judgment motion – in particular, Escobar's own admissions to law enforcement – confirms the money's substantial connection to the drug trade. A reasonable jury could not find otherwise. In so concluding, the Court has considered such evidence as a whole. A trial of this matter would be a wasteful exercise. "Summary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993). This is just such a case.

---

[8] In deciding the Government's summary judgment motion, this Court has not relied upon any evidence that Escobar contends is subject to suppression or is otherwise objectionable or equivocal, such as the manner in which the seized money was packaged. Moreover, suppression of seized currency for evidentiary purposes has no impact whatsoever on the money's forfeitability. It is well established that illegally seized funds may still be subject to forfeiture. United States v. $37,780 in U.S. Currency, 920 F.2d 159, 163 (2d Cir. 1990).

## CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment is granted and the Government is directed to submit an appropriate Judgment to that effect.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 29, 2006

ERIC N. VITALIANO
United States District Judge